**Not for Publication**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Criminal No. 17-0379 (ES)** |
| v. | **OPINION** |
| **EARL WILLIAMS** | |

**MCNULTY, DISTRICT JUDGE**

Before the Court is defendant Earl Williams's motion (DE 37) for a reduction of sentence under the First Step Act, 18 U.S.C. § 3582(c)(1)(A). The Government opposes the motion. (DE 38). This matter has been reassigned from Judge Salas to me for purposes of this motion. Having considered the parties' submissions, I decide this matter without oral argument. *See* Fed. R. Crim. P. 43(b)(4); *United States v. Styer,* 573 F.3d 151, 154 (3d Cir. 2009). For the following reasons, the motion is DENIED.

**I.    BACKGROUND**[1]

On September 19, 2017, Mr. Williams pled guilty to a one-count information charging him with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g). (DE 21–23). On February 27, 2018, Mr. Williams was sentenced by the Honorable Jose L. Linares (ret.) to 90 months of

---

[1] Citations to documents in the record will be abbreviated as follows:
   Mov. Br. = Mr. Williams's brief in support of his motion, DE 37
   Opp. Br. = Government's brief in opposition to the motion, DE 38
   Sentencing Tr. = Transcript of Mr. Williams's sentencing, DE 31

imprisonment and three years of supervised release. (DE 27). Mr. Williams has been in custody since his arrest on November 7, 2016, and is serving out his sentence at FCI Allenwood Medium. (Mov. Br. at 2). His projected release date is March 29, 2023. (*Id.*; *see also* Exhibit D).[2]

Williams now moves this Court for a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A) based on his underlying physical and mental medical conditions and the COVID-19 pandemic. (*See generally* Mov. Br.).[3] The Government opposes the Motion.

## II. LEGAL STANDARDS

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, 18 U.S.C. § 3582(c)(1) provides as follows:

> (A) court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden

---

[2] Mr. Williams submitted to the Court *in camera* four exhibits which were not filed on the public docket. These exhibits include his medical records from 2018 (Exhibit A), 2019 (Exhibit B), and 2020 (Exhibit C) as well as his BOP Sentry Report (Exhibit D). Because the privacy implications are obvious, I will order these exhibits to be filed under seal. Two other exhibits—the warden's response to Mr. William's request for release (Exhibit E) and the affidavit of Dr. Brie Williams (Exhibit F)—were filed on the docket by defense counsel without any request for sealing. (DE 37-1 & DE 37-2).

[3] Williams initially filed a *pro se* motion for release. (DE 34). Pursuant to the District of New Jersey's Standing Order 2020-08, the Court informed the Office of the Federal Public Defender of the pending *pro se* motion. Following counsel's appearance, the Court terminated the *pro se* motion and set a briefing schedule for a renewed motion. (DE 36). I note, however, that I have reviewed the *pro se* submission in deciding this motion.

> of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
>> (i) extraordinary and compelling reasons warrant such a reduction;
>>
>> [. . .]
>>
>> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .
>
> *See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020).

The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community; and (iii) release from custody complies with the section 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

### III.   ANALYSIS

#### A.   Exhaustion

Before proceeding to the merits of a motion for a reduction in sentence, a defendant must meet § 3582(c)(1)(A)'s exhaustion requirement, which requires either that 30 days have passed since the receipt of a compassionate release

3

request by a warden, or that the defendant has exhausted all administrative remedies. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

The Government does not dispute that the exhaustion requirement is met here: Mr. Williams submitted a request for compassionate release to the warden at FCI Allenwood on or around August 7, 2020, and the request was denied on August 18, 2020. (Mov. Br. at 2; Opp. Br. at 8; DE 37-1, Exhibit E). Thus, more than 30 days have passed since the Warden received Mr. Williams's request, and the Court may address the merits of the motion.

**B. Extraordinary and Compelling Reasons for Reduction**

Congress directed the Sentencing Commission to define the "extraordinary and compelling reasons" standard. *United States v. Alexander*, No. 19-0032, 2020 WL 2507778, at *3 (D.N.J. May 15, 2020). The Sentencing Commission issued a policy statement in which an application note lists three specific circumstances that qualify as extraordinary and compelling; generally speaking, the enumerated circumstances include: (i) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover; (ii) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; or (iii) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner. U.S.S.G. §

4

1B1.13, Application Note 1(A)–(C). In addition, the Sentencing Commission included a catchall provision, which provides that "other reasons" may be sufficient if "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

Based on the subsequent passage of the First Step Act and the unique circumstances of the COVID-19 pandemic, I do not treat the examples in the policy statement as exclusive, and I consider all relevant circumstances.[4] As I have stated in a prior opinion, in the current climate, "[t]he 'extraordinary and compelling reasons' inquiry logically has two components: (a) identification of a medical condition that renders the defendant particularly vulnerable to serious consequences if infected with COVID-19; and (b) the likelihood of COVID-19 infection, with particular reference to conditions in the institution in which the

---

4      I look to the Guidelines, application notes, and commentary for guidance. I will assume, however, that they do not limit what a court, within its discretion, may find "extraordinary and compelling." I therefore do not weigh in on the vexed question of the significance of the Sentencing Commission's failure, as of yet, to amend the Guidelines to conform to the First Step Act. (The Commission has a number of long-standing vacancies, and lacks a quorum. https://www.ussc.gov/about/who-we-are/organization.)

Something like a consensus appears to be emerging that section 1B1.13 does not limit the discretion of a court considering compassionate release under the First Step Act. *See United States v. Brooker*, 976 F.3d 228 (2nd Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 281 (4th Cir. 2020) ("When a defendant exercises his new right to move for compassionate release on his own behalf, in other words, § 1B1.13 does not apply."); *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020) (holding that "the passage of the First Step Act rendered § 1B1.13 'inapplicable' to cases where an imprisoned person files a motion for compassionate release"); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("Section 1B1.13 addresses motions and determinations of the Director, not motions by prisoners.").

defendant is incarcerated." *United States v. Moore*, No. 19-101, 2020 WL 4282747, at *3 (D.N.J. July 27, 2020).

### i. Medical Conditions

Mr. Williams argues that he suffers from several physical and mental medical conditions which warrant the relief he requests. (Mov. Br. at 4). Specifically, he suffers from obesity, elevated blood pressure, prediabetes, and gastroesophageal reflux disease ("GERD"). (*Id.* at 4–6). Mr. Williams also has been diagnosed with Post Traumatic Stress Disorder and has a history of depressive disorder. (*Id.* at 6). Mr. Williams also cites a history of smoking. (*Id.*). This "combination of health problems," Williams argues, is extremely problematic in the context of a prison setting and thus constitutes an extraordinary and compelling reason for relief. (*Id.* at 6 & 9).

By now, the severity of the COVID-19 virus is widely recognized and need not be discussed at length. The key facts about the virus are not disputed by the parties: COVID-19 is a dangerous illness which has created an unprecedented public health crisis; the virus can be transmitted from person to person, even by persons who display no symptoms; and to thwart the spread of the virus, certain measures—such as social distancing, wearing cloth face coverings around others, and frequent hand washing—must be taken. (*See e.g.*, Opp. Br. at 2–3; Mov. Br. at 7–9).[5] Although there are modes of treatment and

---

[5] *See How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL AND PREVENTION ("CDC"), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html. (last visited December 30, 2020).

most of the infected recover, many others do not. And while vaccine rollouts have begun, due to limited doses and other restrictions, it will be some time before the entire population has the option to be vaccinated.

The CDC have identified groups of individuals who "*are* at increased risk of severe illness" from COVID-19 and who "*might be* at an increased risk of increased illness from COVID-19.[6] Courts around the country have used the CDC's lists as a guidepost for evaluating the severity of medical conditions in the context of COVID-19 and requests for compassionate release. *See e.g.*, *United States v. Dent*, No. 18-20483, 2020 WL 4783921, at *3 (E.D. Mich. Aug. 17, 2020) (relying on the CDC's classifications to conclude that defendant's cited medical condition was insufficient to meet the extraordinary and compelling standard); *United States v. Henries*, No. 00-0788, 2020 WL 4727090, at *2 (D.N.J. Aug. 14, 2020) (same); *United States v. Henry*, No. 04-0004, 2020 WL 4748537, at *5 (D. Md. Aug. 17, 2020) ("This Court's analysis of an individual's virus-related concerns is heavily guided by the CDC's published risk factors for incurring a severe, life-threatening case of COVID-19."). I, too, use these lists as a guide, though they do not, standing alone, have the force of law.

Under the CDC guidelines, the only one of Mr. Williams's stated medical conditions that places him at an increased risk of severe illness from COVID-19

---

[6] *See People With Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. (last visited December 30, 2020).

7

is his obesity. (*See* Opp. Br. at 9 & n.9). According to the CDC, "[h]aving obesity, defined as a body mass index (BMI) between 30 kg/m² and <40 kg/m² or severe obesity (BMI of 40 kg/m² or above), increases your risk of severe illness from COVID-19."[7] Medical records from the BOP state that as of January 28, 2020, Mr. Williams had a BMI of 35.5[8] (Exhibit C at 14). Mr. Williams, then, has at least one condition which places him in the CDC's at-risk category.

Exacerbating this risk, Williams argues, are his other medical conditions. Williams cites to recent blood pressure readings to suggest that he suffers from Hypertension Stage 1 or "High Normal" blood pressure. (Mov. Br. at 5). According to the CDC, individuals with normal blood pressure have systolic blood pressure at or below 120 mm Hg and diastolic blood pressure at or below 80 mm Hg. Individuals with elevated blood pressure have systolic blood pressure between 120 and 129 mm Hg and diastolic blood pressure at or below 80 mm Hg. And individuals with hypertension stage one have systolic blood pressure between 130 and 139 mm Hg and diastolic blood pressure between 80 and 89 mm Hg.[9]

I have reviewed the BOP medical records provided by Mr. Williams from

---

[7] *See id.*

[8] The January 28, 2020 reading of 35.5 appears to be the most recent BMI calculation done by the BOP. Medical records from 2018 show a slightly lower BMI of 33. (Exhibit A at 11). More recent medical records dated August 13, 2020, indicate a weight that would correspond to a BMI of 37.4. All of these figures fall within the "obese" but not "severely obese" category as defined by the CDC.

[9] *High Blood Pressure*, CDC, https://www.cdc.gov/bloodpressure/facts.htm. (last reviewed September 8, 2020) (last visited December 30, 2020).

2018, 2019, and 2020. They reveal a handful of normal blood pressure readings (Exhibit A at 1, 37 & 48; Exhibit B at 10 & 43; Exhibit C at 23), a couple of elevated readings (Exhibit A at 15 & 31; Exhibit B at 27), and a few readings in the hypertensive (stage one) range (Exhibit B at 5 & 27; Exhibit C at 18). It is unclear whether Mr. Williams has been diagnosed with high blood pressure or hypertension. (*See e.g.*, Exhibit A at 22, 28, 34 & 70 (noting that hypertension was denied)). And Mr. Williams himself points out that he is not required to monitor his blood pressure with medication. (Mov. Br. at 5).

Thus, although there is evidence of elevated blood pressure readings in the record, there is not sufficient evidence that he suffers from high blood pressure or hypertension. Even assuming he does suffer from one or the other, such a condition would not certainly, but only "might," place Williams at risk for a more severe reaction if infected with COVID-19.

The remaining medical conditions—GERD, prediabetes, and mental health issues—do not warrant extended discussion here[10]: none appears on the CDC's published lists as either certainly or potentially placing Mr. Williams at an increased risk of severe illness from COVID-19. Moreover, Mr. Williams does not present any evidence to support his claim that these conditions somehow

---

[10]   I do not mean to diminish the general health risks associated with these conditions. However, the extraordinary and compelling reason analysis requires the Court to consider (under U.S.S.G. § 1B1.13) whether the defendant has a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care and from which he or she is not expected to recover. Under the court's more liberal approach in the context of COVID-19, the inquiry focuses on whether the defendant has certain risk factors which place him at an increased risk of severe illness if he were to contract COVID-19. There is no evidence to suggest that Mr. Williams's remaining medical conditions fall into either category.

exacerbate his risk of serious illness from COVID-19. (*See* Mov. Br. at 5–6).

In sum, the most concerning condition Mr. Williams suffers from is his obesity; and while there may be some research to suggest that his other condition(s) *may* add to his risk of severe illness from COVID-19, based on the CDC's guidance and the evidence presented, they do not certainly do so. Still, defendant's obesity, whether or not enhanced by his other conditions, is sufficient to support a threshold finding of extraordinary circumstances, because it does increase his risk of severe consequences should he contract COVID-19. That does not, however, equate to a finding that his application must be granted.[11] I consider his medical status in light of the conditions at FCI Allenwood and the likelihood of infection, *Moore*, 2020 WL 4282747, at *3, as well as the § 3553(a) and dangerousness factors.

### ii. Conditions at FCI Allenwood Medium

The potential for widespread transmission of COVID-19 in the prison setting is readily apparent given the nature of the environment and the impracticability of enforcing social distancing guidelines. However, the BOP has

---

[11] Obesity, even in conjunction with other medical conditions not considered risk factors, has not always equated to extraordinary and compelling circumstances requiring compassionate release. *See e.g., United States v. Falci*, No. 17-0228, 2020 WL 3410914, at *1, *4 (D.N.J. June 22, 2020) (denying motion for compassionate release where defendant was 60 years old and suffered from obesity, hypertension, and other health issues); *United States v. Bleicher*, No. 19-0099, 2020 WL 2744606, at *3 (D.N.J. May 27, 2020) (denying compassionate release for a defendant with a BMI of 37.7); *Alexander*, 2020 WL 2507778, at *4 (denying compassionate release where defendant suffered from hypertension and obesity but medical records showed that Bureau of Prisons was "adequately managing [his] medical care").

implemented safety procedures to reduce the risk of transmission.[12] These include limits on visitation, limited social distancing (facilities permitting), intake and quarantining procedures, testing, limits on movement of prisoners, screening of staff and visitors, and so on. (*See* Opp. Br. at 3–4).

Despite these procedures, Williams argues, BOP facilities are "breeding grounds" for COVID-19, and the BOP's infection rate far exceeds the national average. (Mov. Br. at 6–9). However, such generalities about infection rates in prison facilities, alone, do not establish the requisite extraordinary circumstances. *See Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."). I consider the infection statistics at FCI Allenwood Medium in particular.

FCI Allenwood Medium is a medium security federal correctional institution housing 1,077 inmates.[13] According to the BOP website, as of December 30, 2020, COVID testing yielded 90 positive results among inmates and 22 among staff members.[14] In addition, 302 inmates and 14 staff members

---

[12] *See BOP Modified Operations*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/covid19_status.jsp (November 25, 2020 update) (last visited December 30, 2020).

[13] *See FCI Allenwood Medium*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/alm/. (last visited December 30, 2020).

[14] *See COVID-19 Cases*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/. (last visited December 30, 2020).

have had and recovered from the virus.[15] Fortunately, there have been no deaths at the facility resulting from COVID-19.

Case law from this district reveals that FCI Allenwood fared well early on in the pandemic but currently is suffering from a large outbreak at the facility which it does not appear to have under control. *Compare United States v. Terry*, No. 16-210, 2020 WL 3264086, at *3 (D.N.J. June 17, 2020) ("According to the most recent figures on the BOP website, there are no positive cases at the Allenwood complex (low security and medium security"), *with United States, v. Tejohn Cooper*, No. 14-699-12, 2020 WL 7249437 (D.N.J. Dec. 9, 2020) (noting that as of the filing of the defendant's motion, there were 121 inmates at the facility who tested positive for the virus).

Moreover, the FCI Allenwood numbers appear to be fluctuating, making it difficult to determine whether they are improving. For example, in his moving brief (filed on November 16, 2020), defendant reported that there were no reported cases of COVID-19 at FCI Allenwood. (Mov. Br. at 8). In its opposition brief, the Government reported that as of November 27, 2020, there were 92 positive inmates and 4 positive staff members at FCI Allenwood Medium. (Opp. Br. at 4–5). On December 10, 2020, one court noted that there were 45 positive inmates at FCI Allenwood Medium, despite there having been 102 positive

---

[15] As of December 30, 2020, FCI Allenwood Medium had conducted 913 inmate COVID tests with 399 positive results. However, "[t]he number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once. The number of tests recorded per site reflects the number of persons at the specific facility who have been tested, whether at that site or at a prior facility." *See COVID-19 Inmate Test Information*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/. (last visited December 30, 2020).

12

inmates just seven days prior. *United States v. Newkirk*, No. 18-699, 2020 WL 7260739, at *2 n. 5 (S.D.N.Y. Dec. 10, 2020). As of December 15, 2020, another judge in this district "recognize[d] that there have been 47 cases of COVID-19 inmates at FCI Allenwood Medium." *United States v. Gideon*, No. 13-429, 2020 WL 7351212, at *2 (D.N.J. Dec. 15, 2020). And two days later on December 17, 2020, another court reported only 6 positive inmate cases at FCI Allenwood Medium. *United States v. Gregor*, No. 19-64-11, 2020 WL 7405732, at *2 (D. Conn. Dec. 17, 2020). As of December 30th, the BOP reports 90 positive inmate cases at the facility.

Suffice it to say that, despite earlier downward trends, FCI Allenwood now has many more cases than it did previously. It is still experiencing a substantial outbreak of infections. *See United States v. Greenhow*, No. 15-00221, 2020 WL 7384721, at *3 (D.N.J. Dec. 16, 2020) (noting that "[t]he COVID-19 outbreak at Allenwood continues.").

Based on the foregoing, I accept that William's medical conditions, in the context of a substantial outbreak at FCI Allenwood Medium, satisfy the initial showing of extraordinary and compelling circumstances. Even assuming Mr. Williams meets this threshold requirement, however, the Court is required to look further and specifically consider whether the section 3553(a) factors favor release, and whether Mr. Williams would pose a danger to society if released. These considerations, I ultimately conclude, warrant denying the motion.

## C. Section 3553(a) Factors and Dangerousness

Notwithstanding any finding of extraordinary and compelling circumstances, I must consider the foregoing in the context of the familiar sentencing factors of 18 U.S.C. § 3553(a), "to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A).[16] *United States v. Brown*, Nos. 07-0890, 07-0019, 2020 WL 2466081, at *4 (D.N.J. May 13, 2020).

---

[16] **(a) Factors to be Considered in Imposing a Sentence.** — The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed—

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for—

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

14

On February 27, 2018, the Hon. Jose L. Linares sentenced Mr. Williams to 90 months' imprisonment and three years of supervised release. Prior to doing so, Judge Linares determined that Mr. Williams's guidelines sentencing range was 130-162 months; this range was capped, however, by the statutory maximum of 120 months. (Sentencing Tr. at 4:14–16). In fashioning Mr. Williams's sentence, the Court considered, *inter alia*, the seriousness of the offense, the need for specific and general deterrence, and the need to protect the public and promote respect for the laws. Judge Linares ultimately found a variance from the 120-month Guidelines sentence appropriate. The variance was based on the defendant's history and characteristics, specifically Mr. Williams's exposure to drugs at a very early age and his subsequent addiction.

---

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement—

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In considering Mr. Williams's motion, I am guided by the findings made by Judge Linares at sentencing, which still hold true today. Specifically, as Judge Linares found, the crime committed here is a serious one: Mr. Williams possessed a stolen, loaded gun in a high crime area and was involved in the distribution of drugs. (Sentencing Tr. at 40:1–9). Mr. Williams possessed a loaded, stolen .45 caliber handgun and was carrying 170 glassine envelopes of heroin and 30 vials of cocaine. In light of the seriousness of the offense, there is a need to promote respect for the laws that deal with the prohibition of the possession of guns and ammunition by convicted felons. (*Id.* at 40:10–21). As Judge Linares also found, both specific and general deterrence are necessary: specific deterrence is necessary for this particular defendant, who "has committed a lot of crimes, has been sentenced a lot of times, and continues to be involved . . . [in] the commission of crimes." (*Id.* at 40:21–41:3). General deterrence is necessary "to send the appropriate message to the public that this type of activity can lead to substantial incarceration." (*Id.* at 41:7–10). There is also a need to protect the public from the defendant's repeated criminal activity. (*Id.* at 41:4–5).

Such considerations must be viewed in light of the defendant's recidivism. His criminal history category was VI, the highest tier under the Guidelines. His prior offenses consisted of various forms of possession and possession with intent to distribute narcotics, as well as receipt of stolen property. It may be true, as Judge Linares believed, that much of this conduct was addiction-driven. It is also true, as Judge Linares found, that the prior

16

offenses did not involve violence.[17] But the trend, culminating in drug dealing while in possession of a loaded firearm, is concerning. In short, this criminal conduct spans the defendant's adult life, and the Court cannot feel confident that the defendant has left it behind.

Nevertheless, these favorable or sympathetic factors did lead Judge Linares to vary below the Guidelines sentence of 120 months' incarceration. (*Id.* at 41:18–43:1). To the extent that defendant invokes them here, they have largely been taken into account. As a result, they do not weigh as heavily as they might against continued incarceration. *See United States v. Hammond*, No. 18-0184, 2020 WL 2126783, at *3 (W.D. Pa. May 5, 2020) (explaining that the COVID-19 pandemic did not justify a further reduction of defendant's sentence); *United States v. Mortensen*, No. 11-0095, 2020 WL 2549970, at *2 (D. Nev. May 19, 2020) (denying motion for release because, although defendant's law abiding lifestyle led to a downward variance at sentencing, "the seriousness of his conviction and the events surrounding it" now outweighed those considerations).

I weigh heavily the defendant's recidivism. Mr. Williams has repeatedly engaged in criminal activity notwithstanding several periods of incarceration and leniency shown by other judges. (Sentencing Tr. at 42:13-17); *see Moore*,

---

[17] Neither Judge Linares nor the Government disputed that fact at sentencing. (*See e.g.*, Sentencing Tr. at 23:8–19 (AUSA stating that she would "absolutely agree" with the Court's assessment that "there are no convictions for any crimes involving violence"). Indeed, Judge Linares pointed out that "the fact that there [are] no violent crimes involved here and no gang affiliations, it does send a message that this is an addiction driven problem." (*Id.* at 42:19-22).

2020 WL 4282747, at *7 (denying motion for compassionate release, notwithstanding the fact that defendant's projected release date was less than four months away, because of defendant's recidivism); *United States v. DeSciscio*, No. 88-0239, 2020 WL 3893711, at *7 (D.N.J. July 10, 2020) (emphasizing the need to protect the public "from even a possibility of recidivism" in denying a motion for compassionate release).

Mr. Williams cites his good behavior while incarcerated and his desire to better himself, as evidenced by his participation in educational and training programs while incarcerated. (Mov. Br. at 11; *see also* DE 34 at 5; DE 34-1 at 4-6); *see also United States v. McNair*, No. CR 04-267 (FLW), 2020 WL 5036201, at *5 (D.N.J. Aug. 26, 2020) (rehabilitation in prison, while not extraordinary and compelling in itself, may contribute to such a finding)). The Court commends Mr. Williams's efforts in this regard; however, they are not sufficient to overcome the necessity to satisfy the statutory goals of sentencing outlined above.

Considering all of the foregoing, reducing defendant's sentence by approximately 45%[18] would fail to reflect the balance of the § 3553(a) factors—namely, the seriousness of the crime, the need to promote respect for the law, general and specific deterrence, and the need to protect the public from future crimes. *See Brown*, 2020 WL 2466081, at *4 (concluding that the § 3553(a) factors weighed against granting defendant's motion for a reduced sentence);

---

[18] Mr. Williams argues that he has served nearly 70 percent of his custodial sentence, if anticipated good time credit and early release to home confinement are subtracted. (Mov. Br. at 2). My alternative calculation is based on Mr. Williams's time served and the 90-month sentence imposed.

*DeSciscio*, 2020 WL 3893711, at *7. Accordingly, an analysis of the § 3553(a) factors warrants denial of the motion.

### D. Dangerousness

Additionally, I must evaluate dangerousness pursuant to 18 U.S.C. § 3142(g). In connection with pretrial detention, that inquiry involves (i) the nature and circumstances of the offense; (ii) the weight of the evidence against the person; (iii) the history and characteristics of the person; and (iv) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Factor (ii) is mooted by the defendant's conviction; factors (i) and (iii) largely duplicate the § 3553(a) considerations discussed above. Factor (iv), the nature of the danger, is not favorable to the defendant. The danger to the community from armed drug dealing, particularly given the defendant's criminal record, is apparent. *See United States v. Pass*, No. 10-0739, 2020 WL 2332001, at *3 (E.D. Pa. May 11, 2020).

Having weighed all of the relevant factors, I will deny the defendant's motion for compassionate release under the First Step Act, 18 U.S.C. § 3582(c)(1)(A).

### E. Home Confinement

Finally, Mr. Williams's motion includes an alternative request for the Court to "allow him to serve the remainder of his sentence under home confinement pursuant to 18 U.S.C. § 3624(c)(2)." (Mov. Br. at 2). However, the Court has no authority to grant such relief. "[O]nly the Bureau of Prisons has

19

the actual authority to designate the place of incarceration." *United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *see also Aigebkaen v. Warden*, No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion."). Accordingly, this alternative request is also denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion is DENIED. An appropriate Order accompanies this Opinion.

Dated: January 4, 2021                                     /s/ Kevin McNulty
                                                           _____
                                                           Kevin McNulty, U.S.D.J.